IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Case No. 02-12687 (JKF) |
| | ) |
| ACandS, Inc., | ) Chapter 11 |
| | ) |
| | ) Related to DN 3109 and 3291 |
| _____ Debtor | ) |

Hearing Date:  May 6, 2008 at 11:00 a.m.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
CONFIRMATION OF ACANDS'S SECOND PLAN OF REORGANIZATION
DATED NOVEMBER 19, 2007, AS MODIFIED**

ACandS, Inc. ("ACandS" or "Debtor"), as debtor and debtor in possession,

having proposed and filed ACandS's Second Plan of Reorganization of ACandS, Inc., dated

November 19, 2007 (Docket No. 3109] (the "Plan")[1] and the Disclosure Statement in respect of

the Plan, also dated November 19, 2007 (Docket No. 3107) (the "Disclosure Statement"); and

the Disclosure Statement having been approved by the Bankruptcy Court as containing

"adequate information" pursuant to § 1125 of the Bankruptcy Code (Docket No. 3116) (the

"Disclosure Statement Order"); and the procedures for solicitation and tabulation of votes to

accept or reject the Plan having been approved by the Bankruptcy Court pursuant to the

Disclosure Statement Order; and upon the *Declaration Of Jeffrey S. Stein Of The Garden City Group,*

*Inc. Certifying The Methodology For The Tabulation Of Votes And Results Of Voting With Respect To*

*The Second Plan Of Reorganization Of ACandS, Inc.* (Docket No. 3280) (the "Stein Declaration");

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or other
Plan Document in the Court's Order confirming the Plan.

and upon the *Affidavits of Publication for Publication Notice and Asbestos Publication Notice*

(the "Omnibus Certification of Publication") (Docket No. 3237) attesting to the fact that the

Confirmation Hearing Publication Notices (as hereinafter defined) were published in accordance *AND upon the Affidavit of Laurence Fitzpatrick*

with the Disclosure Statement Order; and upon the *Declaration of James E. Hipolit In Support In Support*

*Of Confirmation Of ACandS's Second Plan of Reorganization Dated November 19, 2007* (the *of Confirmation of the Second*

"Declaration in Support of Plan Confirmation") (Docket No. 3282) (collectively, with the Stein *Plan of*

Declaration and the Omnibus Certification of Publication, the "ACandS Confirmation *the Fitzpatrick Affidavit Reorganization*

Documents"); and each of the Objections (as hereinafter defined) having been resolved or *of ACandS*

withdrawn; and the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") *Inc Under*

having conducted an evidentiary hearing to consider confirmation of the Plan on May 6, 2008 *Chapter 11 of the*

(the "Confirmation Hearing"); and the Court having reviewed and considered the Plan, the *United States*

Disclosure Statement, the Disclosure Statement Order, the Debtor's Confirmation Documents, *Bankruptcy Code,*

and the entire record of the Confirmation Hearing; and the Court being familiar with the Plan and *Dated*

other relevant factors affecting ACandS's chapter 11 case (the "Chapter 11 Case"); and the Court *November*

having taken judicial notice of the entire record of the Chapter 11 Case since the Petition Date; *19, 2007)*

and the appearance of all interested parties having been duly noted in the record of the *(Docket #*

Confirmation Hearing; and after due deliberation and sufficient cause appearing therefor; *3279) (the "Fitzpatrick Affidavit")*

IT IS HEREBY FOUND, CONCLUDED, AND ADJUDGED, AS FOLLOWS:

## PRELIMINARY FINDINGS AND CONCLUSIONS

1.    The Court has jurisdiction to conduct the Confirmation Hearing and to

confirm the Plan pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b), and this Court has jurisdiction to enter a final order with respect thereto.

2.    In connection with the Confirmation Hearing, the Court has core jurisdiction under 28 U.S.C. § 157(b)(2)(B), (L), and (O), 11 U.S.C. § 502 (c) and Bankruptcy Rule 3018(a) to confirm the Plan, and enter the Injunctions contemplated by the Plan.

3.    The Debtor was and is qualified to be a debtor under section 109(a) of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "Bankruptcy Code"), and the Debtor is a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code.

4.    Each of the conditions precedent to confirmation of the Plan and entry of the Confirmation Order has been satisfied in accordance with section 8.1 of the Plan.

## FINDINGS OF FACT[2]

**A.    The General History and Business of the Debtor**

5.    From the time it commenced operations in January 1958, the Debtor was an insulation contracting company, primarily engaged in the installation of thermal and mechanical insulation.  The Debtor maintains its corporate headquarters in Pennsylvania.  Since 1969, the Debtor has been a wholly-owned subsidiary of Irex.

**B.    Asbestos Issues**

6.    The Debtor has been named as one of many co-defendants in hundreds of thousands of lawsuits pending nationwide by individuals seeking damages for personal injuries

---

[2] The Findings of Fact and Conclusions of Law contained herein constitute the findings of fact and conclusions of law required to be entered by the Bankruptcy Court pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

allegedly caused by exposure to asbestos fibers. The lawsuits allege exposure to asbestos fibers released during the Debtor's past business operations, which sometimes involved the use of asbestos.

7.    From the beginning of 1981 through early 2002, the Debtor settled, dismissed or otherwise resolved approximately 247,000 individual Asbestos Personal Injury Claims. As of the Petition Date, more than 300,000 Asbestos Personal Injury Claims were pending against the Debtor or had been settled but not paid.

8.    Aggregate liability costs for cases resolved in 2001 were three times those for 1999, and double those for 2000. In addition, defense expenditures more than tripled from 1999 to 2001. In the last part of 2001, jury awards generally began to escalate, with particular severity in certain jurisdictions. For example, in the last four months of 2001, the Debtor sustained adverse verdicts in four different proceedings in Texas, Mississippi, Southern Illinois and Baltimore, each of which exceeded $3 million. This included verdicts of approximately $84 million for the Mississippi plaintiffs in Mississippi (the "Mississippi Verdict"), $12 million for a single claimant in Illinois, and $15 million for a single claimant in Baltimore, Maryland. (The Debtor settled each of these verdicts prior to the Petition Date.)

9.    The $84 million Mississippi Verdict was rendered in favor of six individuals represented by Byrd and Associates, PLLC (the "Byrd Firm"): James Curry, Earnest Jordan, Simeon Johnson, Charles White, Bobby Lawrence, and Phillip Pate (the "Mississippi Claimants").

C.     **General Historic Discussion of Insurance Coverage**

      10.    Historically, the Debtor has been covered for defense costs and liability payments incurred on Asbestos Personal Injury Claims by primary and excess third party liability insurance policies in effect from the day it commenced operations (January 1, 1958) until at least January 1, 1980. At the primary level, the Debtor was covered by policies issued by Travelers Indemnity Co. ("Travelers Indemnity") from January 1, 1958 through January 1, 1963, and by policies issued by Aetna Casualty and Surety Co. (now Travelers Casualty and Surety Company, ACand S's primary insurer referred to herein for itself and/or its related entities as "Travelers") from January 1, 1963 through January 1, 1980. Each of these primary policies provides $1 million in annual products/completed operations aggregate limits. At the excess level, the Debtor prior to 1966 had between $5.5 million and $10.5 million in products/completed operations limits each year, issued by several different insurers. From January 1, 1966 through January 1, 1980, the Debtor had $40 million in excess products/completed operations limits in each year. For the period January 1, 1958 through April 1, 1969, the Debtor's general liability coverage was shared with its former parent company, Armstrong, except for the primary insurance policies written by Travelers Indemnity for the period January 1, 1959 to January 1, 1963, in which Armstrong did not share.

      11.    With the exception of certain policies providing asbestos-related coverage for the 1980 and 1981 policy periods, the value of which is limited by significant deductible or self-insured retention obligations, or which were written for a limited scope of coverage, all of the Debtor's post-January 1, 1980 general liability insurance policies contain asbestos-related

exclusions. The scope and effectiveness of the asbestos-related exclusions for many of the policies written prior to 1988 have not been finally resolved.

**D.    The Travelers Insurance Issues**

12.    The Debtor and Travelers engaged in litigation in various state, federal and arbitral forums, off and on, for more than twenty-five years concerning disputes over the extent of Travelers' obligations to provide coverage for the Debtor's asbestos-related defense costs and liabilities. Currently, at least four actions are pending in three federal courts, as well as proceedings between the parties in the Chapter 11 Case (collectively, the "Coverage Litigation"). Although Debtor believes that Travelers is obligated under the Travelers Insurance Policies to pay substantial amounts for the Debtor's asbestos-related liabilities, Travelers asserts multiple coverage defenses, at least some of which, if successful, would eliminate all coverage under the Travelers Insurance Policies. Further, Travelers filed claims in the bankruptcy case asserting, among other things, that the Debtor owes them millions of dollars that they believe they overpaid to the Debtor prior to the bankruptcy filing. The Coverage Litigation involves substantial risks to both parties, including the possibility that Travelers could be found to have no further obligation to the Debtor.

13.    Following years of litigation and unsuccessful settlement efforts (including with the aid at various times of three prominent mediators), the Debtor and Travelers entered into the Settlement and Policy Buyback Agreement on July 5, 2007. Under the Settlement and Policy Buyback Agreement, Travelers agreed to pay $449 million into escrow shortly after approval of the settlement by the Bankruptcy Court. The settlement amount and all

income earned thereon from the time it was paid into escrow (net of taxes and attorneys' fees payable therefrom) will be transferred to the Trust shortly after the Plan is confirmed and becomes effective. Certain conditions must be satisfied before the Settlement and Buyback Agreement becomes final and binding and the settlement amount and income thereon are transferred to the Trust, including the following conditions that the Plan satisfies: (1) the provision of certain injunctive protection for Travelers and injunctive protection for the Irex Entities, (2) the effectuation of the sale back to Travelers of the Travelers Insurance Policies pursuant to section 363 of the Bankruptcy Code, including the issuance of the 363 Injunction, and (3) the incorporation into a plan of reorganization of releases and certain other protections for the benefit of Travelers.

14.    Following broad notice to all Creditors, given directly and/or through publication, the Bankruptcy Court approved the Settlement and Buyback Agreement on August 27, 2007. Travelers paid the full settlement amount -- $449 million --into escrow on September 4, 2007, and income has been generated on the settlement amount since.

15.    The Settlement and Buyback Agreement resolves over twenty-five years of heavily-litigated disputes with Travelers over coverage that is the Debtor's most valuable asset. Absent settlement, the Debtor would face significant risks in litigation with Travelers and in concluding a successful bankruptcy case.

E.    **The Pre-Petition Process and the Irex Settlement**

*General Background*

16.    Beginning in the Fall of 2001, in view of Travelers' assertion that the

Debtor was on the verge of exhausting its insurance coverage and the adverse developments in

the tort system, the Debtor began to discuss with Travelers and certain plaintiffs' lawyers

alternatives to the Debtor remaining in the tort system.

17.    Counsel for certain Asbestos Personal Injury Claimants organized an

unofficial pre-petition Asbestos Personal Injury Claimants Committee (the "Pre-Petition

Asbestos Personal Injury Claimants Committee").  The Pre-Petition Asbestos Personal Injury

Claimants Committee consisted of counsel who represented a majority of the Debtor's then-

known asbestos-related bodily injury claimants.  During the Debtor's pursuit of its pre-petition

strategy of filing a pre-packaged plan of reorganization, the Pre-Petition Asbestos Personal

Injury Claimants Committee negotiated with the Debtor over the terms of a proposed pre-

packaged chapter 11 plan.

18.    In anticipation that Travelers and other insurers might refuse to honor their

coverage obligations and because the Debtor did not have sufficient non-insurance assets to fund

ongoing settlements, the Debtor decided to attempt to settle trial-listed and other asbestos-related

bodily injury claims at fair values (based on their value in the tort system at that time) in

consideration for an assignment to settled Asbestos Personal Injury Claimants of interests in and

proceeds from specified insurance policy limits.  The Debtor also established the Pre-Petition

Trust to, among other things, hold a security interest in certain of the Debtor's insurance

proceeds for the benefit of the settled Asbestos Personal Injury Claimants. This settlement mechanism, which is set forth in several agreements (referred to herein collectively as the "Settlement Agreements"), enabled the Debtor to resolve the majority of claims against it for reasonable values, and at the same time to pursue both the Coverage Litigation and its pre-petition pre-packaged bankruptcy strategy, as discussed below.

19.    Under the Settlement Agreements, Asbestos Personal Injury Claimants who participated in the transaction would be deemed secured creditors of the Debtor by virtue of a security interest granted to the Pre-Petition Trustee on behalf of and in trust for those Asbestos Personal Injury Claimants who qualified to receive distributions from the Pre-Petition Trust. The Settlement Agreements created five separate priority classes of settled secured Asbestos Personal Injury Claimants, with the priority based generally on the timing of each Asbestos Personal Injury Claimant's settlement with the Debtor. All Asbestos Personal Injury Claimants in the highest-level priority class (known as "Category A") either were paid in full prior to the Petition Date or failed to submit timely the necessary qualifying information and became unsecured. The settled secured Asbestos Personal Injury Claimants in the second priority class (known as "Category Bx") received a partial distribution prior to the Petition Date, to the extent they had qualified at that time. (No other payments have been made to the holders of Asbestos Secured Claims.) The Settlement Agreements adopted accepted standards of proof concerning exposure and injury customary in settling Asbestos Personal Injury Claims. The agreed settlement amounts represent heavily-negotiated figures that reflected various factors, including historical

settlement values, the trends in the disposition of Asbestos Personal Injury Claims discussed above, recent jury awards, and the costs of litigating unsubstantiated claims.

20.    One of the firms with whom ACandS negotiated was the Byrd Firm, on behalf of the Mississippi Claimants.  Under the terms of the settlement, the total amount of the Mississippi Verdict was reduced to approximately $8.16 million (the "Byrd Settlement" and the "Byrd Settlement Amount"), with the Byrd Settlement Amount being designated as having a Category C payment priority.

21.    The Pre-Petition Trust Agreement was executed between the Debtor and the Pre-Petition Trustee, Dan B. Lain of Lain, Faulkner & Company, on April 17, 2002.  In conjunction with the establishment of the Pre-Petition Trust, the Debtor assigned certain collateral to the Pre-Petition Trust.  The collateral assigned includes, but is not limited to, a lien, or security interest, on Insurance Proceeds, all as defined and detailed in the Settlement Agreements (the "Collateral").

22.    The Pre-Petition Trust Agreement established a priority for distributions of Collateral (collectively, the "Collateral Payment Priorities") to be made from the Trust on account of Asbestos Secured Claims.  Those Collateral Payment Priorities are being waived and released by agreement of the Pre-Petition Trustee and by operation of the Plan.

### *Irex Reviewed Transactions*

23.    As part of the pre-petition effort to negotiate a pre-packaged plan, the Pre-Petition Asbestos Personal Injury Claimants Committee reviewed potential claims that Asbestos Personal Injury Claimants or the Debtor itself might have against the Irex Entities.  These

potential claims included derivative Asbestos Personal Injury Claims against the Irex Entities as

well as potential claims for the value of transfers made by the Debtor to the Irex Entities during

four years preceding the Petition Date (the "Look-Back Period" and the "Reviewed Claims").

### *History of the Irex Settlement*

24.     In 2002, the Pre-Petition Asbestos Personal Injury Claimants Committee

retained L. Tersigni Consulting, P.C. ("Tersigni") to conduct a due diligence review of the

Reviewed Claims (other than the insurance settlements discussed above) and other ACandS

transactions.  Tersigni's due diligence review consisted of an investigation of the past and

present business activities of the Debtor and the relationship between the Debtor and its

Affiliates, including the Reviewed Claims described above (other than the insurance

settlements).  The Debtor and Irex cooperated with Tersigni in its investigation and produced

numerous documents in response to the requests of Tersigni.  Tersigni personnel also

interviewed Debtor and Irex personnel concerning the Reviewed Claims.  The Pre-Petition

Asbestos Personal Injury Claimants Committee, the Debtor and the Irex Entities then conducted

extensive negotiations concerning the Reviewed Claims (including the insurance settlements).

25.     As a result of arms'-length negotiations, the Pre-Petition Asbestos

Personal Injury Claimants Committee agreed to settle all claims against the Irex Entities,

including the Reviewed Claims.  This initial settlement called for the Irex Entities to contribute

certain assets to the Trust including (i) 100% of the common stock of the Debtor, (ii)

$10,000,000 in cash to be paid over time from Irex, (iii) their rights in the Asbestos Insurance

Policies and (iv) their rights in asbestos insurance recoveries, in accordance with the provisions

of the settlement.[3] During the pendency of the Chapter 11 Case, the Creditors Committee and the Legal Representative renegotiated this agreement. The terms of the renegotiated agreement are embodied in the Irex Settlement Agreement, which is attached to the Plan as Exhibit 5.

26.    Pursuant to the renegotiated Irex Settlement, the Irex Entities will contribute to the Debtor on the Effective Date real estate with an appraised value of $900,000 which will generate rental income for the Debtor. The Irex Entities will also contribute to the Trust, among other things, (i) 100% of the common stock of the Debtor, (ii) $11,600,000 in cash from Irex (of which $425,000 shall be paid to the Trust by SPI pursuant to the terms of the Release and Settlement Agreement), to be paid over time to the Trust in accordance with the terms of the Irex Settlement Agreement, and (iii) the Transferred Insurance Rights. (The Transferred Insurance Rights are crucial to the feasibility of the Plan.)

27.    Additionally, SPI has agreed to release certain indemnification rights it holds against the Debtor and certain other Irex Entities pursuant to the Irex Settlement Agreement and pursuant to the Release and Settlement Agreement (the "SPI Releases"). The SPI Releases also are a critical element of the Irex Settlement Agreement and the Release and Settlement Agreement because they provide crucial further protection to the Debtor and the Irex Entities from Asbestos Personal Injury Claims, including Derivative Claims, which claims might

---

[3]    In conjunction with this transaction, on July 22, 2003, the Debtor, Irex, the Irex Affiliates and the Former Irex Affiliates entered into a Release and Settlement Agreement attached to the Disclosure Statement as Exhibit H (the "Release and Settlement Agreement") under which the Former Irex Affiliates agreed to release the Debtor, Irex and the Irex Affiliates, and the Debtor, Irex and the Irex Affiliates agreed to release the Former Irex Affiliates, from any and all causes of action or claims arising out of or related to the asbestos-related activities of the Debtor. The terms of the Release and Settlement Agreement provide for Irex, on behalf of itself, the Debtor and the Irex Affiliates, to pay to SPI (on the Effective Date) US$300,000 in consideration for the release described above and for SPI, on behalf of itself and the other Former Irex Affiliates, to pay to the Trust (on the Effective Date) US$425,000 in consideration for the SPI Releases described above and the injunction, releases and discharges referred to below.

otherwise circumvent the processes for satisfying such Asbestos Personal Injury Claims under the Plan.

28.    In return for the SPI Releases, SPI will receive the benefit of the section 105 and/or 524(g) injunctions embodied in the Section 524(g) Injunction and the Asbestos Property Damage Claim Injunction, in accordance with applicable law. SPI has represented that, without the protection offered by the provisions of the Plan, SPI would not contribute the SPI Releases to the Irex Settlement Agreement and the Release and Settlement Agreement, and would not contribute $425,000 to the Trust in accordance with the terms of the Release and Settlement Agreement.

29.    In return for these contributions by the Irex Entities, the Creditors Committee agreed, pursuant to the terms of the Irex Settlement Agreement and subject to confirmation of the Plan, that the Irex Entities would be released and discharged under the Plan for any and all Asbestos Personal Injury Claims, Derivative Claims and certain other claims relating to insurance and the placement of insurance and to intercompany transactions and receive the benefit of the Section 524(g) Injunction and the Irex Entities Injunction.

**F.    The Original Plan**

30.    On February 3, 2003, the Debtor filed its original plan of reorganization in this case (as subsequently modified, the "Original Plan"). The Original Plan incorporated the Collateral Payment Priorities established by the Pre-Petition Agreements. The Bankruptcy Court held a hearing concerning confirmation of the Original Plan on December 15, 2003. Following the confirmation hearing on the Original Plan, the Bankruptcy Court issued a written

recommendation that confirmation of the Original Plan be denied on various grounds, principally relating to the Bankruptcy Court's perception of inequities generated by the Collateral Payment Priorities.  Thereafter, various appeals and objections followed.

31.    Subsequent to the Bankruptcy Court's January 2004 recommendation that the Debtor's Original Plan not be confirmed, the Third Circuit Court of Appeals issued its opinion in *In re Combustion Engineering*, 391 F.3d 190 (3rd Cir. 2006) ("*Combustion Engineering*").  The *Combustion Engineering* opinion also called into question the confirmability of a plan of reorganization that included payment priorities along the lines set forth in the Original Plan

32.    Given these developments, negotiations ensued between and among the Debtor, the Legal Representative, the Creditors Committee and lawyers representing certain of the claimants who had unsatisfied prepetition settlements with the Debtor.  These negotiations concerned, among other things, the disposition of the settlements of Asbestos Personal Injury Claimants entered into by the Debtor, the disposition of the prepetition liens granted by the Debtor to the Pre-Petition Trust, and strategies for reaching resolution of the Debtor's coverage dispute with Travelers.  These negotiations occurred on a parallel track with settlement negotiations the Debtor was undertaking with Travelers that culminated in the Settlement and Buyback Agreement.

**G.    Procedural Status.**

33.    On November 20, 2007, ACandS filed the Plan with the Bankruptcy Court.

34.    On November 20, 2007, ACandS filed the Disclosure Statement with respect to the Plan.

35.    A hearing to consider the adequacy of the Disclosure Statement of the Plan was conducted by the Bankruptcy Court on January 4, 2008 (the "Disclosure Statement Hearing").

36.    A key feature of the Plan is the establishment of the Trust, into which all present Asbestos Claims and future Demands against ACandS will be channeled.

37.    On January 7, 2008, by the Disclosure Statement Order, the Bankruptcy Court: (a) approved (i) solicitation and tabulation procedures and (ii) the forms of ballots and master ballots (collectively, the "Ballots") to be used in connection with the solicitation of votes to accept or reject the Plan (the "Voting Procedures"); (b) found that sufficient and timely notice of the Disclosure Statement Hearing was given in accordance with the Bankruptcy Rules and orders of the Bankruptcy Court; and (c) approved the Disclosure Statement as containing "adequate information" within the meaning of § 1125 of the Bankruptcy Code.  (Disclosure Statement Order, Docket No. 3116).

38.    The Voting Procedures authorized and directed The Garden City Group, Inc. (the "Voting Agent"), on behalf of ACandS, to solicit acceptances and rejections of the Plan in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and in accordance with the procedures set forth in the Disclosure Statement Order and the Voting Procedures.

39.    Pursuant to the Disclosure Statement Order and the Voting Procedures, on January 18, 2008, ACandS, by its Voting Agent, caused Solicitation Packages (consisting of:

(i) notice of the Confirmation Hearing; (ii) Disclosure Statement Order; (iii) the Disclosure

Statement and all exhibits attached thereto, including the Plan; (iv) for entities entitled to vote,

appropriate Ballots and/or Master Ballots; and (v) for entities entitled to vote, pre-addressed,

postage-paid, return envelopes) ) to be transmitted by postage prepaid, First Class U.S. Mail to

(a) each holder of a Claim listed in the Debtor's Schedules as of the Voting Record Date as

liquidated, undisputed and noncontingent and with a claim amount in excess of $0.00 (other than

Asbestos Personal Injury Claims); (b) each holder of a Claim represented by a proof of claim

filed against the Debtor that had not been withdrawn, disallowed or expunged by an order of the

Bankruptcy Court entered on or before the Voting Record Date (other than a proof of claim

asserting Asbestos Personal Injury Claims); (c) each party listed on the Schedules as a party to an

executory contract or an unexpired lease with the Debtor; (d) the holder of record of the Interests

in the Debtor; (e) the Securities and Exchange Commission; (f) the Office of the United States

Trustee for the District of Delaware; (g) the attorneys for the Creditors Committee; (h) the

attorneys for the Future Claimants' Representative; (i) the Internal Revenue Service; (j) the

Pension Benefit & Guaranty Corporation; (k) the applicable Pennsylvania state and local taxing

authorities; (l) each party that filed a notice of appearance with the Bankruptcy Court and had not

withdrawn such notice of appearance as of the Voting Record Date; and (m) each attorney that,

upon information and belief, was known by the Debtor (as reflected in the records of the Debtor

on or before the entry of the Disclosure Statement Order) to represent or potentially represent

individuals who may hold or assert Asbestos Personal Injury Claims.  With respect to those

attorneys who filed 2019 Statements on or before the 2019 Statement Deadline for individuals

with Asbestos Personal Injury Claims, the Solicitation Package included a Master Ballot and a postage paid return envelope. Solicitation Packages were not served upon the individual holders of Asbestos Personal Injury Claims, except to the extent that (i) an individual holder of an Asbestos Personal Injury Claim requested a Solicitation Package; (ii) a proof of Asbestos Personal Injury Claim was signed and filed by an individual holder of an Asbestos Personal Injury Claim prior to the Voting Record Date; or (iii) an attorney advised the Voting Agent of the names and addresses of individuals who hold or may assert Asbestos Personal Injury Claims who should receive their own Solicitation Packages (in which case the Voting Agent caused to be served thereon a Solicitation Package, together with an appropriate Ballot and return envelope. (Stein Declaration at ¶ 3).

40.    The Disclosure Statement Order and Voting Procedures, among other things, authorized and directed ACandS to publish two (2) forms of notice: (a) a publication notice (the "Publication Notice") and an asbestos publication notice (the "Asbestos Publication Notice" and, collectively with the Publication Notice, the "Notices") setting forth the approval of the Disclosure Statement, the Voting Deadline, the time and place of the Confirmation Hearing, the time and date by which objections to confirmation of the Plan were required to be filed, and other pertinent information.

41.    The Notices were timely published pursuant to the requirements set forth in the Disclosure Statement Order. See Omnibus Certification of Publication.

42.    ACandS's publication of the Notices complied in all material respects with the requirements of the Voting Procedures, and the Disclosure Statement Order.

43.    ACandS's distribution of the Solicitation Packages complied with the requirements of the Disclosure Statement Order and the Voting Procedures.

44.    The Disclosure Statement Order (i) established the date and time by which all Ballots were required to be completed, executed, marked and actually received by the Voting Agents in order to be counted as timely acceptances or rejections of the Plan (the "Voting Deadline") as March 24, 2008, at 5:00 p.m., Wilmington, Delaware time and (ii) established March 24, 2008, at 4:00 p.m., Wilmington, Delaware time, as the date and time for filing objections to confirmation of the Plan (the "Objection Deadline").

45.    The Bankruptcy Court scheduled the continued Confirmation Hearing on May 6, 2003 at 11:00 a.m., Pittsburgh, Pennsylvania time.

**H.    Classification of Claims and Interests Under the Plan**

46.    The Plan designates the following classes of Claims and Interests:

Class 1 — Priority Claims

Class 2 — Non-Asbestos Secured Claims

Class 3a — Category $B^x$ Asbestos Personal Injury Claims

Class 3b — Category $B^y$ Asbestos Personal Injury Claims

Class 3c — Category C Asbestos Personal Injury Claims

Class 3d — Category D Asbestos Personal Injury Claims

Class 3e — Asbestos Unsecured Personal Injury Claims

Class 4 — General Unsecured Claims

Class 5 — Non-Asbestos Unsecured Insured Litigation Claims

Class 6 — Interests.

(Plan, Article IV).

47.    All Claims within each Class are substantially similar to the other Claims in that Class, and the Class of Interests (Class 6) consists of a single holder of Interests. (Plan, Article II).

48.    Section 4.2 of the Plan identifies each of the following Classes as unimpaired under the Plan: Classes 1 and 2. Pursuant to § 1126(f) of the Bankruptcy Code, the holders of Claims in these Classes, and, therefore, these Classes, are conclusively presumed to have accepted the Plan.

49.    There are no identified Claims in Class 5.

50.    The Voting Agent made a final determination of the validity of, and tabulation respecting, all acceptances and rejections of the Plan by the impaired Classes of Claims and Interests entitled to vote on the Plan, and the Stein Declaration sets forth such results, including the amount and number of Claims of each Class voting to accept or reject the Plan and the amount of Interests of the Class voting to accept or reject the Plan. The following summarizes, by each impaired Class, the voting on the Plan:

| CLASS | ACCEPT THE PLAN | | REJECT THE PLAN | |
|---|---|---|---|---|
| | Dollar Amount Voted/ Percentage of Total Dollar Amount | Number of Votes/ Percentage of Number of Votes | Dollar Amount Voted/ Percentage of Total Dollar Amount | Number of Votes/ Percentage of Number of Votes |
| Class 3a | $452,978,340.59 100% | 6,545 100% | $0 0% | 0 0% |

| Class 3b | $54,063,667.30<br>100% | 7,795<br>100% | $0<br>0 % | 0<br>0% |
| Class 3c | $83,726,306.40<br>90.97% | 1,590<br>99.56% | $8,310,000.00<br>9.03% | 7<br>.44% |
| Class 3d | $1,372,472,762.50<br>99.95% | 155,152<br>99.92% | $691,500<br>.05% | 123<br>.08% |
| Class 3e | $1,715,530,087.50<br>96.43% | 233,597<br>99.77% | $63,426,500<br>3.57% | 548<br>.23% |
| Class 4 | $109.70<br>100% | 1<br>100% | $0<br>0% | 0<br>0% |
| Class 5 | $0<br>0% | 0<br>0% | $0<br>0% | 0<br>0% |
|  | Amount Voted / Percentage of Total Amount | | Amount Voted / Percentage of Total Amount | |
| Class 6<br>Interests | 1,000 shares<br>100% | | 0 shares<br>0% | |

Stein Declaration at ¶ 11.  Accordingly, each of Classes 3a, 3b, 3c, 3d, 3e and 4 has accepted the Plan by at least two-thirds in amount and a majority in number of the Claims in each such Class actually voting.  Class 6 has accepted the Plan by at least two-thirds of the allowed Interests in Class 6 held by the holder of such Interests that has voted on the Plan.

      51.    Class 3a, 3b, 3c, 3d and 3e Claims have voted by at least 75 percent (75%) of those voting in favor of the Plan.

      52.    The determination of the Voting Agent with respect to the voting on the Plan validly and correctly sets forth the tabulation of votes, as required by the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order.

## I.　　**Objections to Confirmation of the Plan**

　　　　53.　　Objections to confirmation of the Plan (collectively, the "Objections")
were filed by the following parties:

- Owens Illinois, Inc. ("OI")

- The Byrd Firm

　　　　54.　　All of the Objections have been satisfied by agreements set forth in the
Confirmation Order or, in the case of the Objection of OI, a stipulation filed with the Court.

## J.　　**The Trust and the Injunctions**

　　　　55.　　The Plan establishes the Trust, to which all Asbestos Claims are being
channeled.

　　　　56.　　The identity of the proposed trustee of the Trust was disclosed at the
Confirmation Hearing to be the Honorable Alfred M. Wolin (Ret.).  The identities of the
proposed members of the Trustees' Advisory Committee (the "TAC") were disclosed at the
Confirmation Hearing and are as follows:  Matthew Bergman, Bryan O. Blevins, Jr., John D.
Cooney, Steven Kazan, Joseph F. Rice, Armand J. Volta, Jr., and Perry Weitz.

　　　　57.　　With respect to any Claim that is allowed by the Trust in accordance with
the Trust Agreement and the TDP, such allowance shall establish the amount of legal liability
against the Trust in the amount of the liquidated value of such Claim, as determined in
accordance with the TDP.

58.     The Injunctions are to be implemented in connection with the Plan and the Trust.

59.     The Trust, as of the Effective Date, will assume the liabilities of ACandS with respect to Trust Claims.  Upon such assumption, The Reorganized Debtor shall have no liability for any Trust Claim.

60.     Pursuant to Section 9.1 of the Plan, on the later of the Effective Date and the date by which the Trustee has executed the Trust Agreement, ACandS will transfer to the Trust the Trust Assets, including 100% of the common stock of ACandS.  Accordingly, the Trust will be funded in whole or in part by securities of the Reorganized Debtor.

61.     The Trust will own, as of the Effective Date, all of the common stock of The Reorganized Debtor, constituting 100% of the voting shares of ACandS.

62.     As of the Petition Date, the Debtor has been named as a defendant in personal injury or wrongful death actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

63.     The Trust, upon the Effective Date, will assume the liabilities of the Debtor with respect to Trust Claims.

64.     The Trust is to use its assets and income to pay Trust Claims and to pay any Trust Expenses and any indemnity obligations pursuant to the terms of the Trust.

65.     The Debtor is likely to be subject to substantial future Demands for payment arising out of similar conduct or events that gave rise to the Trust Claims, which are addressed by the Section 524(a) Injunction.

66.    The actual amounts, numbers and timing of future Demands cannot be determined.

67.    Pursuit of Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Asbestos Personal Injury Claims, and Demands.

68.    Pursuant to court orders or otherwise, the Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims and Demands that involve similar claims or other comparable mechanisms, that provide reasonable assurance that the Trust shall value, and be in a financial position to pay, similar Asbestos Personal Injury Claims and Demands that involve similar Claims in substantially the same manner.

69.    The assignments by (1) the Debtor and (2) the Irex Entities to the Trust of rights in relation to the Asbestos Insurance Policies made under the terms of the Plan and the Plan Documents do not violate any consent-to-assignment provisions of any applicable insurance policy, agreement or contract.

70.    The confirmation and consummation of the Plan will provide the Trust with no lesser rights to insurance coverage and/or insurance payments under the Asbestos Insurance Policies in connection with the Trust Claims channeled to the Trust than would be available to the Debtor and the Irex Entities absent confirmation of the Plan.

71.    The Legal Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Section 524(a) Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Section 524(a) Injunction and transferred to the Trust.

72.    The Court has jurisdiction to enter the Injunctions under sections 1334(a), (b) and (d) of title 28 of the United States Code.

73.    Sections 105(a) and 524(g) of the Bankruptcy Code permit approval and entry of the Injunctions, especially where, as here, such injunctions are essential to the formulation and implementation of the Plan as provided in section 1123(a)(5) of the Bankruptcy Code, confers material benefits on ACandS's estate, is in the best interests of holders of Claims against ACandS, and complies in all respects with the requirements of section 524(g) of the Bankruptcy Code.

74.    The terms of the Injunctions, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan and in the Disclosure Statement.

75.    In light of the benefits provided, or to be provided, to the Trust on behalf of each Protected Party, the Injunctions are fair and equitable with respect to the persons that might subsequently assert Demands against any Protected Party and shall be approved as part of the Plan.

76.    The Plan otherwise complies with section 524(g) of the Bankruptcy Code.

77.    The Trust is (a) approved by the Bankruptcy Court and is subject to its

continuing jurisdiction, (b) established to resolve or satisfy one or more contested or uncontested

claims that have resulted or may result from an event (or related series of events) that has

occurred and that has given rise to at least one claim asserting liability arising out of a tort,

breach of contract, or violation of law, and (c) a trust under applicable state law, or its assets are

otherwise segregated from other assets of Irex, ACandS, and the Irex Entities.

78.    The Plan establishes, in Classes 3a, 3b, 3c, 3d and 3e, separate Classes of

the Creditors whose Claims are to be addressed by the Trust.

## K.    "Best Interests" Test

79.    Under the Plan, Claims or Interests in Classes 3a, 3b, 3c, 3d, 3e, 4,  and 5

(to the extent any Class 5 Claims exist) are impaired.  Consequently, each holder of a Claim or

Interest in such Classes must either accept the Plan or receive or retain under the Plan property of

a value, as of the Effective Date, that is not less than the value such holder would receive or

retain if ACandS were liquidated under chapter 7 of the Bankruptcy Code.  11 U.S.C. §

1129(a)(7).

80.    The Claims in Classes 1 and 2 are unimpaired under the Plan.

Consequently, each holder of a Claim in each of such classes is conclusively deemed to have

accepted the Plan under section 1126(f) of the Bankruptcy Code.  11 U.S.C. § 1126(f).  The "best

interests" test is, accordingly, not applicable to the recoveries of such Classes.

81.    The liquidation analysis attached the Disclosure Statement accompanying

the Plan (the "Liquidation Analysis") was prepared by ACandS.  The Liquidation Analysis

provides a summary of the liquidation values of ACandS's assets assuming a chapter 7

liquidation in which a bankruptcy trustee appointed by the Bankruptcy Court would liquidate the

assets of ACandS's estate. The information and conclusions in the Liquidation Analysis relating

to the values that would be achieved in such a liquidation are reasonable.

82.    The sole Interest holder in Class 6 has voted to accept the Plan, and,

therefore, the "best interests" test is inapplicable to Class 6. As reflected in the Liquidation

Analysis, the recovery to holders of Claims in Classes 3a, 3b, 3c, 3d, 3e, 4 and 5 of the Plan

under the Liquidation Analysis is less than such creditors will receive under the Plan. Each

Creditor that did not accept the Plan will receive property of a value that is worth at least as

much under the Plan as it would receive in a chapter 7 liquidation of ACandS. Therefore, the

Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code as to all such

holders.

## L.    The Plan Is Fair And Equitable To Class 5

83.    The Plan does not engage in "unfair discrimination" in respect to Class 5

Claims (to the extent that any Class 5 Claims exist) as such Claims should be paid in full from

available insurance proceeds.

## M.    Feasibility Of The Plan

84.    Cash flow projections for The Reorganized Debtor are attached to the

Disclosure Statement accompanying the Plan.

85.     ACandS estimates that it will have sufficient cash on hand as of the

Effective Date from which to pay Allowed Administrative Expenses, Allowed Priority Claims

and Allowed Priority Tax Claims.

86.     Additionally, the contribution of the Trust Assets and other value being

transferred to the Trust pursuant to the Plan ensures that the Trust will have sufficient capital

upon the Effective Date to begin expeditiously processing Trust Claims and otherwise meet its

financial commitments.  Accordingly, the Plan meets the feasibility test of section 1129(a)(11) of

the Bankruptcy Code.

**N.     The Provisions Governing Distributions Under the Plan Are Fair and Reasonable**

87.     The provisions governing distributions under the Plan are fair and

reasonable.

**O.     The Release Is Fair and Reasonable**

88.     In order to preserve and promote the settlements contemplated by and

provided for in the Plan, and to supplement, where necessary, the injunctive effect of the

discharge provided in sections 1141 and 524 of the Bankruptcy Code and as described in Article

IX of the Plan, section 10.2 of the Plan (the "Release") provides for the release of the Released

Claims.

89.     The Release is a necessary counterpart to the discharge provisions of the

Plan to ensure that Creditors do not "end run" the Plan's discharge provisions by pursuing any

claims against any of the Released Parties that are based upon a Claim against the Debtor.  Each

of the Released Parties - the Debtor, the Irex Entities, the ACandS Related Parties, and the

Released Non-Debtor Parties – has contributed extensively to the Debtor's reorganization process through its efforts in moving the Plan towards confirmation and, in the particular case of the Irex Entities and each Settling Asbestos Insurance Company, making significant financial contributions that make the Plan feasible.

90. The Release is fair to all of the affected creditors. All major constituents in the Chapter 11 Case support all provisions of the Plan, including the Release. In addition, the Debtor fully disclosed the terms and scope of the proposed Release in the Plan and the Disclosure Statement and has described in detail the entities that would be protected by the Release. With notice and an opportunity to review the Plan and Disclosure Statement, the overwhelming majority of creditors have voted in favor of the Plan. Without the contributions and support of the Released Parties, the Plan would not have provided for such a fair and equitable recovery to all Creditors, including the holders of the Asbestos Personal Injury Claims. Second, the Release is clearly necessary to a successful reorganization. The Release is an integral part of the Plan and its inclusion in the Plan was a key element of the negotiations in formulating the ultimate terms of the Plan. Eliminating the protections afforded by the Release at this point would render it impossible for the Debtor to implement the Plan.

91. The Release was also given in exchange for fair consideration. The Release derives from settlements among certain major constituencies in the Chapter 11 Case. As part of that process, the parties receiving the benefit of the Release have made substantial contributions to the Debtor's reorganization.

**P.**     **The Byrd Settlement is Reasonable and in Interests of the Estate.**

92.     The settlement of the objection of the Byrd Firm to the Plan (the "Byrd Settlement") is reasonable and in the best interests of the estate, as it settles potentially complex and expensive litigation at no cost to the estate.

93.     The exoneration of Irex in respect of the Byrd Settlement is fair, just and reasonable, given Irex's substantial contribution to the estate in conjunction with the Byrd Settlement.

**Q.**     **Miscellaneous**

94.     To the extent any of the foregoing findings of fact constitute conclusions of law, they are adopted as such.

## CONCLUSIONS OF LAW

**A.**     **Jurisdiction and Venue**

1.     The Bankruptcy Court has jurisdiction over the Chapter 11 Case and to confirm the Plan pursuant to 28 U.S.C. §§ 1334 and 157.

2.     Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Bankruptcy Court has jurisdiction to enter a final order with respect thereto.

3.     Venue of the Chapter 11 Case in this district was proper as of the Petition Date and continues to be proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     ACandS is an Entity qualified to be a debtor under section 109 of the Bankruptcy Code, and ACandS is a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code.

**B.**    **Burden of Proof**

5.    ACandS has satisfied its burden of producing evidence that the Plan complies with sections 1129(a), 1129(b), 1129(d) and 524(g) of the Bankruptcy Code.

**C.**    **Solicitation**

6.    All persons required to receive notice of the Confirmation Hearing have received proper, timely and adequate notice in accordance with the Disclosure Statement Order and have had an opportunity to appear and be heard with respect thereto.

7.    ACandS has solicited and tabulated votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order.

8.    Following the dissemination of the Solicitation Packages as provided for in the Disclosure Statement Order, the Voting Agent properly assisted ACandS in soliciting votes from the Plan from the impaired classes of Claims and Interests by answering various questions from holders of Claims regarding the Plan, with the guidance and advice of ACandS's counsel, and appropriately solicited the votes of the impaired classes of Claims and Interests in good faith and in a manner consistent with the Bankruptcy Code.

9.    The Plan was voted on by all Classes of impaired Claims that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order.

**D.**    <u>The Plan Satisfies Section 1129(a)(1) Of The Bankruptcy Code</u>

        10.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code. The Plan satisfies all the applicable provisions of the Bankruptcy Code, and, as required by Bankruptcy Rule 3016(a), the Plan is dated and identifies ACandS as the proponent of the Plan.

**E.**    <u>Due and Proper Notice of the Disclosure Statement Hearing and the Confirmation Hearing Was Given to All Parties In Interest</u>

        11.    The Bankruptcy Court has taken judicial notice of the Stein Declaration and the Omnibus Certification of Publication, and finds and concludes that (a) ACandS complied in all material respects with Bankruptcy Rules 2002 and 3017(a) in providing notice of the Disclosure Statement Hearing in the method and manner as prescribed therein, and (b) ACandS complied in all material respects with the Disclosure Statement Order in providing notice of the Confirmation Hearing in the method and manner as prescribed in the Disclosure Statement Order. All Entities entitled and required to receive notice of the Disclosure Statement Hearing and the Confirmation Hearing pursuant to Bankruptcy Code, applicable non-bankruptcy law, and the orders of the Bankruptcy Court have received due, proper, timely and adequate notice of such hearings and have had an opportunity to appear at and be heard at such hearings.

**F.**    <u>The Plan Satisfies the Requirements of Section 1123(a)(1) of the Bankruptcy Code</u>

        12.    Section 1123(a)(1) of the Bankruptcy Code provides that a plan must designate classes of claims and interests. Section 3.1 of the Plan adequately and properly classifies all Claims and Interests required to be so classified and, accordingly, satisfies section

1123(a)(1) of the Bankruptcy Code.  Classes of Administrative Claims and Priority Tax Claims

are not required to be designated pursuant to section 1123(a)(1) of the Bankruptcy Code.

**G.**    **The Plan Satisfies the Requirements of Section 1122 of the Bankruptcy Code**

13.    Section 1122(a) of the Bankruptcy Code provides that a plan may place a

claim or interest in a particular class if such claim or interest is substantially similar to the other

claims or interests of such class.  A classification structure satisfies section 1122 of the

Bankruptcy Code when a reasonable basis exists for the structure, and the claims or interests

within each particular class are substantially similar.

14.    In accordance with section 1122(a) of the Bankruptcy Code, Section 3.1 of

the Plan separately classifies Claims against and Interests in ACandS together with Claims

against or Interests that are substantially similar to the other Claims or Interests of such Class.

The Plan, therefore, satisfies section 1122(a) of the Bankruptcy Code.

**H.**    **The Plan Satisfies The Requirements Of Section 1123(a)(2) Of The Bankruptcy Code**

15.    Section 11239a)(2) of the Bankruptcy Code provides that a plan must

specify any class of claims or interests that is not impaired under the plan.  Pursuant to

Section 4.2 of the Plan, each of Classes 1 and 2 is identified as unimpaired, and each of Classes 3

through 5 is identified as impaired.  Accordingly, the Plan satisfies section 1123(a)(2) of the

Bankruptcy Code.

**I.      The Plan Satisfies The Requirements Of Section 1123(a)(3) Of The Bankruptcy Code**

       16.     Section 1123(a)(3) of the Bankruptcy Code provides that a plan must specify the treatment of each impaired class of claims and interests. Article III of the Plan specifies the treatment of each impaired Class of Claims and Interests. Accordingly, the Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

**J.      The Plan Satisfies The Requirements Of Section 1123(a)(4) Of The Bankruptcy Code**

       17.     Section 1123(a)(4) of the Bankruptcy Code requires a plan to provide the same treatment for each claim or interest of a particular class, unless the holder of the claim or interest agrees to less favorable treatment of such particular claim or interest. The Plan provides the same treatment for each Claim or Interest in each Class. Accordingly, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

**K.      The Plan Satisfies The Requirements Of Section 1123(a)(5) Of The Bankruptcy Code**

       18.     Section 1123(a)(5) of the Bankruptcy Code provides that a plan must provide adequate means of implementation of the plan. The various provisions of the Plan provide adequate means for implementation of the Plan.

**L.      The Plan Satisfies The Requirements of Section 1123(a)(6) Of The Bankruptcy Code**

       19.     Section 1123(a)(6) of the Bankruptcy Code requires a plan to provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation to which the debtor transfers all or any part of the debtor's estate or with which the debtor has merged or consolidated, of a provision prohibiting the issuance of non-voting equity securities.

In furtherance of Section 9.4 of the Plan, the Amended and Restated Articles of Incorporation of The Reorganized Debtor contain provisions prohibiting the issuance of non-voting equity securities. Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

**M. The Plan Satisfies The Requirements Of Section 1123(a)(7) Of The Bankruptcy Code**

20. Section 1123(a)(7) of the Bankruptcy Code requires that the manner of selection of any director, officer or trustee of the reorganized debtor, or any successor to such officer, director or trustee, be consistent with the interests of creditors and equity security holders and with public policy. In furtherance of Section 7.21 of the Plan, ACandS has disclosed in the Disclosure Statement the identity of the person who will serve, on the Effective Date, as the officer of The Reorganized Debtor. (Disclosure Statement, Section 4.2).

21. On the Effective Date, the board of directors of the Reorganized Debtors will consist of Mr. James Hipolit. Following the Effective Date, and subject to the provisions of any existing employment agreements and the requirements of applicable non-bankruptcy law, the officer of the Reorganized Debtor immediately prior to the Effective Date will serve as the officer of the Reorganized Debtor. The continuation in office of such individual is consistent with the interests of creditors and with public policy. Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

22. Although section 1123(a)(7) of the Bankruptcy Code does not apply to either the Trustee or the members of the TAC established under the Trust Agreement, ACandS has disclosed the identity of the Trustee and the members of the TAC, as well as the role of the Legal Representative under the Trust Agreement.

N.    **Section 1123(b)(2) of the Bankruptcy Code: The Rejection And Assumption of Executory Contracts and Unexpired Leases Are In The Best Interests Of ACandS's Estate**

23.    Pursuant to section 1123(b)(2) of the Bankruptcy Code, a plan may provide for the rejection or assumption and assignment of any executory contract or unexpired lease of the debt or not previously rejected under section 365 of the Bankruptcy Code.

24.    Under section 365 of the Bankruptcy Code, a debtor may assume an executory contract or unexpired lease if (i) outstanding defaults under the contract or lease have been cured under section 365(b)(1) of the Bankruptcy Code, and (ii) the debtor's decision to assume such executory contract or unexpired lease is supported by valid business justifications.

25.    Section 6.1(a) of the Plan provides for the assumption of certain executory contracts. The assumption of executory contracts and unexpired leases subject to the occurrence of the Effective Date, (i) is in the best interests of ACandS, its estate, and Creditors, (ii) is based upon and within ACandS's sound business judgment, (iii) is necessary to the implementation of the Plan, and (iv) satisfies the requirements of section 365(a) of the Bankruptcy Code.

O.    **The Plan Satisfies Section 1123(b)(3) Of The Bankruptcy Code**

26.    Section 1123(b)(3)(A) of the Bankruptcy Code permits a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Section 9.3 of the Plan provides for the approval of the Irex Settlement Agreement. The Irex Settlement is (i) fair and reasonable, (ii) in the best interests of ACandS, its estate, and its creditors, and (iii) necessary to the implementation of the Plan. To the extent applicable, Section 9.3 of the Plan complies with section 1123(b)(3)(A) of the Bankruptcy Code.

27.    The Byrd Settlement is also (i) fair and reasonable and (ii) in the best interests of ACandS, its estate, and its creditors.

28.    Accordingly, the Plan satisfies section 1123(b)(3) of the Bankruptcy Code.

**P.    ACandS Has Satisfied Section 1129(a)(2) Of The Bankruptcy Code**

29.    Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to comply with all of the applicable provisions of the Bankruptcy Code. ACandS has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code. Specifically, (i) ACandS is a proper debtor under section 109 of the Bankruptcy Code, (ii) ACandS has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court, (iii) ACandS has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Voting Procedures, and the Disclosure Statement Order in transmitting the Plan, the Disclosure Statement, the Ballots, and related documents and notices and in soliciting and tabulating votes on the Plan, and (iv) ACandS complied with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, applicable non-bankruptcy law, the local Bankruptcy Rules and the specific rules of the Bankruptcy Court throughout the Chapter 11 Case.

30.    ACandS has complied with the operating guidelines and financial reporting requirements enacted by the United States Trustee by (i) timely filing all operating reports and financial statements and (ii) maintaining and providing proof of insurance.

31.    ACandS has paid all statutory fees required to be paid during the Chapter 11 Case and has filed all fee statements required to be filed.

32.    ACandS has timely filed with the Court all schedules, lists of executory contracts, and statements of financial affairs.

33.    Sufficient and timely notice of the Confirmation Hearing and all other hearings in this Chapter 11 Case has been given to holders of Claims and Interests and all other parties in interest to whom notice was required to have been given.

34.    The solicitation of votes was made following approval and dissemination of the Disclosure Statement to holders of Claims in classes that are impaired and entitled to vote and was made in good faith and in compliance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.  The Ballots of holders of Claims were properly solicited and tabulated.

35.    ACandS has complied with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court and has fulfilled all of the obligations and duties owed to its estate and creditors as required by and set forth in sections 1107 and 1108 of the Bankruptcy Code.  Accordingly, ACandS has satisfied section 1129(a)(2) of the Bankruptcy Code.

Q.    **The Plan Satisfies The Requirements Of Section 1129(a)(3) Of The Bankruptcy Code**

36.    Section 1129(a)(3) of the Bankruptcy Code states that a plan must be proposed in good faith and not by any means forbidden by law.

37.    The Bankruptcy Court has examined the totality of the circumstances surrounding the formulation of the Plan.  The Plan is based on extensive arm's length negotiations between and among ACandS, Travelers, the Legal Representative and the Committee.  The Plan was negotiated with the participation of the Committee, Travelers and the

Legal Representative and reflects the culmination of such efforts. The Plan has been proposed with the legitimate and honest purpose of reorganizing ACandS's business and affairs, restructuring its asbestos-related liability, and maximizing the value available for distribution to Creditors, as evidenced by the overwhelming acceptance of the Plan by Creditors, and the Plan achieves the goal of consensual reorganization embodied in the Bankruptcy Code. Further, the discharge, exculpation and indemnification provided in the Plan have been agreed to in good faith and are consistent with sections 105 and 1129 of the Bankruptcy Code. Thus, ACandS has complied with the "good faith and not by any means forbidden by law" requirement of section 1129(a)(3) of the Bankruptcy Code.

**R.**     **The Plan Satisfies The Requirements Of Section 1129(a)(4) Of The Bankruptcy Code**

38.     Section 1129(a)(4) of the Bankruptcy Code requires that all payments made or to be made by the plan proponent, by the debtor or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, have been approved by, or are subject to the approval of, the court as reasonable.

39.     All payments made by ACandS on account of out-of-the-ordinary-course-of-business transactions have been approved by the Bankruptcy Court, and all payments made or to be made to professionals retained by order of the Bankruptcy Court will be, as set forth in Section 2.2 of the Plan, subject to review and approval of the Bankruptcy Court upon final application under section 330, 331 or 503(b) of the Bankruptcy Code. Accordingly, the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

**S.     The Plan Satisfies The Requirements Of Section 1129(a)(5) Of The Bankruptcy Code**

40.     Section 1129(a)(5) of the Bankruptcy Code requires the proponent of a plan of reorganization to disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and to show that the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.  Section 1129(a)(5) of the Bankruptcy Code also requires the proponent of a plan of reorganization to disclose the identity of any insider that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider.

41.     ACandS has disclosed in the Disclosure Statement, the identity and nature of compensation of the person who will serve, on the Effective Date of the plan, as the director and officer of The Reorganized Debtor.  Moreover, although the identity of the Trustee and TAC is not required to be disclosed, ACandS has also disclosed the identities of the Trustee and the members of the TAC.  See In re Eagle-Picher Indus., Inc., 1996 U.S. Dist. LEXIS 17160, *29-30 (S.D. Ohio 1996) ("The trustees of the § 524(g) trust in this case are not subject to the statutory provision . . . They are not directors, officers or voting trustees of the debtor.").  Accordingly, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

**T.     Section 1129(a)(6) of the Bankruptcy Code Is Not Applicable To The Plan**

42.     Section 1129(a)(6) of the Bankruptcy Code requires a debtor to obtain the approval of any governmental regulatory commission, with jurisdiction over the debtor, with

respect to any rate changes provided for in the debtor's plan of reorganization. The Plan does not provide for any changes in rates that require regulatory approval of any governmental agency. Section 1129(a)(6) of the Bankruptcy Code is accordingly not applicable.

**U.    The Plan Satisfies The Requirements Of Section 1129(a)(7) Of The Bankruptcy Code**

43.    Section 1129(a)(7) of the Bankruptcy Code requires each creditor or interest holder in an impaired class to accept the plan of reorganization or receive or retain under such plan on account of such claim or interest property of a value, as of the effective date of such plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

44.    Based upon the Findings of Fact contained herein, the Liquidation Analysis, and the sworn statements made in the Hipolit Declaration, the Bankruptcy Court concludes that the Plan satisfies the "best interests" test under section 1129(a)(7) of the Bankruptcy Code.

**V.    The Plan Satisfies The Requirements Of Section 1129(a)(8) Of The Bankruptcy Code Other Than In Respect Of Class 5**

45.    Section 1129(a)(8) of the Bankruptcy Code requires that, with respect to each class of claims or interests under a plan, such class either has accepted the plan or is not impaired under the plan. All Classes of impaired Claims that are entitled to vote on the Plan have voted to accept the Plan other than in respect of Class 5 where no votes were received. The Claims in each of Classes 1 and 2 are unimpaired under the Plan and, pursuant to section 1126(f)

of the Bankruptcy Code, holders of unimpaired Claims in such Classes are deemed to have accepted the Plan.

**W.    The Plan Satisfies The Requirements Of Section 1129(b) Of The Bankruptcy Code As To Classes 5**

46.    The Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code as to Class 5 (to the extent any such Claims exist), as the Plan does not discriminate unfairly against Class 5 and no class of Claims or interest junior to Class 5 will receive property having any value under the Plan.

**X.    The Plan Satisfies The Requirements Of Section 1129(a)(9) Of The Bankruptcy Code**

47.    Section 1129(a)(9) of the Bankruptcy Code provides for certain mandatory treatment of claims entitled to priority under the Bankruptcy Code.

48.    As required by section 1129(a)(9)(A) of the Bankruptcy Code, Section 2.1 of the Plan provides that each holder of an Allowed Administrative Claim shall be paid on account of such Allowed Claim, in full, in cash, on the Effective Date of the Plan; provided, however, that ordinary course Administrative Claims shall be assumed and paid by The Reorganized Debtor in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.  In addition, pursuant to Section 2.1 of the Plan, all payments made or to be made (as Administrative Claims ) to professionals retained by orders of the Court will be subject to review and approval by the Bankruptcy Court upon final application under section 330, 331 or 503(b) of the Bankruptcy Code.

49.     Consistent with section 1129(a)(9)(B) of the Bankruptcy Code, Section 4.2(a) of the Plan provides that each holder of an Allowed Priority Claim shall be paid the Allowed Amount of its Allowed Priority Claim, in full, in cash, in an amount equal to such Claim, on the later of the Effective Date and as soon as reasonably practicable after the date such Claim becomes Allowed.

50.     Consistent with section 1129(a)(9)(C) of the Bankruptcy Code, Section 2.2 of the Plan provides that each holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Allowed Priority Tax Claim either in full or in cash, on the Effective Date.

51.     ACandS has sufficient cash to fund payments of Allowed Administrative Claims, Allowed Priority Claims and Allowed Priority Tax Claims.  Accordingly, the Plan satisfies section 1129(a)(9) of the Bankruptcy Code.

**Y.    The Plan Satisfies The Requirements Of Section 1129(a)(10) Of The Bankruptcy Code**

52.     Section 1129(a)(10) of the Bankruptcy Code provides that at least one impaired class of claims must accept a plan of reorganization, determined without including any acceptance of such plan by any insider.

53.     The Plan satisfies section 1129(a)(10) of the Bankruptcy Code because Classes 3a, 3b, 3c, 3d, 3e and 4, which are impaired Classes, have voted to accept the Plan by the requisite majorities.  Because Classes 3a, 3b, 3c, 3d, 3e and 4 contain no insiders, at least one impaired Class entitled to vote on the Plan has voted to accept the Plan by the requisite majorities, determined without including any acceptances of the Plan by insiders.

**Z.**    **The Plan Satisfies The Requirements Of Section 1129(a)(11) Of The Bankruptcy Code**

54.    Section 1129(a)(11) of the Bankruptcy Code requires that a plan be feasible and that the debtor or its successor under such plan would not likely require liquidation or further financial reorganization, except as provided under such plan.

55.    As set forth above in the Findings of Fact, the Reorganized Debtor will be able to satisfy its obligations under the Plan after confirmation.  ACandS has structured the Plan and the Trust to provide appropriate mechanisms and funding to consummate the Plan with a high degree of certainty that the Reorganized Debtor will be able to meet its obligations under the Plan.

56.    Thus, based upon the Findings of Fact and Conclusions of Law contained herein, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code, and The Reorganized Debtor will not likely require liquidation or further financial reorganization after confirmation.

**AA.**    **The Plan Satisfies The Requirements Of Section 1129(a)(12) Of The Bankruptcy Code**

57.    Section 1129(a)(12) of the Bankruptcy Code requires that all fees payable under section 1930 of title 28 of the United States Code, as determined by the court at the hearing on confirmation of the plan, either have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

58.    Section 2.1 of the Plan provides for the payment on the Effective Date (or as soon as practicable thereafter) of all fees payable under section 1930 of title 28 of the United States Code.  All post-consummation fees that are due and payable will be paid by the

Reorganized Debtor until its Chapter 11 Case is closed pursuant to section 350(a) of the Bankruptcy Code. Accordingly, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

**BB.**    **The Plan Satisfies The Requirements Of Section 1129(a)(13) Of The Bankruptcy Code**

59.    Section 1129(a)(13) of the Bankruptcy Code requires the continuation of payment of all retiree benefits, at the level established pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

60.    The Reorganized Debtor has no retiree benefits (within the meaning of section 1114 of the Bankruptcy Code). Accordingly, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

**CC.**    **The Plan Satisfies The Requirements Of Section 1129(d) Of The Bankruptcy Code**

61.    Section 1129(d) of the Bankruptcy Code provides that, on request of a governmental unit, the court may not confirm a plan if its principal purpose is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, as amended. The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933, as amended, and there has been no objection to the Plan by any governmental unit alleging any such avoidance. Accordingly, the Plan satisfies section 1129(d) of the Bankruptcy Code.

**DD.** **The Injunctions And The Establishment Of The Trust Comply With Section 524(g) Of The Bankruptcy Code**

62.    The Plan is a fair, equitable and reasonable resolution of the liabilities of ACandS in respect of Asbestos Personal Injury Claims.

63.    The Trust satisfies the requirements for a trust under section 524(g) of the Bankruptcy Code.

64.    In addition to the protection afforded the debtor or transferees or successors of the debtor under the plan, section 524(g)(4) sets forth the broad categories of third parties who, if alleged to be directly or indirectly liable for Asbestos Personal Injury Claims, may be beneficiaries of the Section 524(a) Injunctions.  Generally, these categories include the following:

a.    A party owning a financial ownership interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor (11 U.S.C. § 524(g)(4)(A)(ii)(I));

b.    A party who has been involved as an officer, director or employee of the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor (11 U.S.C. § 524(g)(4)(A)(ii)(II));

c.    An insurer of the debtor or a past or present affiliate of the debtor, or a predecessor in interest of the debtor (11 U.S.C. § 524(g)(4)(A)(ii)(III)); and

d.    Third parties who have had involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition of, the debtor or a related party, including but not limited to involvement in providing financing

(debt or equity) or advice to an Entity involved in such a transaction or acquiring or selling a

financial interest in an Entity as part of such a transaction (11 U.S.C. § 524(g)(4)(A)(ii)(IV)).

      65.    Each of the Protected Parties falls within one or more of these categories,

or is a representative, Affiliate or subsidiary of an Entity covered by these categories, and is

therefore entitled to the protection of the Section 524(a) Injunction under section 524(g) of the

Bankruptcy Code.

## EE.   The Discharge, Exculpation and Release Provisions Are Consistent With Sections 105 And Other Provisions Of The Bankruptcy Code

      66.    The Bankruptcy Court has jurisdiction to approve the provisions in

Sections 10.1 (Discharge of ACandS), Section 10.2 (Releases) and 9.8 (Exculpation), of the Plan

pursuant to sections 1134(a), (b) and (d) of Title 28 of the United States Code.

      67.    Given the circumstances, the Plan's discharge provisions, Release

provisions, and Injunctions, are proper.  Section 105(a) of the Bankruptcy Code empowers the

court and permits court approval of the discharge, exculpation and indemnification provisions

where, as here, such provisions are essential to the formulation and implementation of the Plan

and confer material benefits on ACandS, its estate and creditors.  The Bankruptcy Court finds

and concludes that it has jurisdiction to approve the discharge, exculpation and release provisions

set forth in the Plan and that such provisions of the Plan are consistent with sections 105 and

1129 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code and are in

the best interests of ACandS's estate and creditors.  *See In re PWS Holding Corp.,* 228 F.3d 224

(3d Cir. 2000); *In re Continental Airlines,* 203 F.3d 203 (3d Cir. 2000); *A.H. Robins Co., Inc. v*

*Piccinin,* 788 F.2d at 1002-03; *In re Combustion Engineering, Inc.,* 295 B.R. 459, 483087 (D.

Del. 2003); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001); *In re Allegheny, Health, Educ., & Research Found.*, 252 B.R. 309, 331 (W.D. Pa. 1999).

68.    The Bankruptcy Court or the District Court, as provided in Section 13.1 of the Plan, may retain jurisdiction over the matters set forth therein and the Confirmation Order as ultimately entered by the Bankruptcy Court and District Court.

## FF.    **Miscellaneous**

69.    To the extent any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

70.    The Byrd Settlement satisfies the requirements for approval of a compromise pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## CONCLUSION

These Findings of Fact and Conclusions of Law shall serve to support the entry of the Confirmation Order and issuance of the Injunctions as set forth in the Confirmation Order.

Dated:    May ___, 2008

_Judith K. Fitzgerald_
The Honorable Judith K. Fitzgerald,
United States Bankruptcy Judge